UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 17-7181 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| GELFMAN BLUEPRINT, INC., and NICHOLAS GELFMAN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.      Since at least January 2014 through at least January 2016 (the "Relevant Period"), the company Gelfman Blueprint, Inc. ("GBI") and its Chief Executive Officer ("CEO") and Head Trader, Nicholas Gelfman ("Gelfman") (collectively, "Defendants"), operated a Bitcoin Ponzi scheme in which they fraudulently solicited participation in a pooled fund that purportedly employed a high-frequency, algorithmic trading strategy, executed by Defendants' computer program called "Jigsaw," to trade the virtual currency Bitcoin, a commodity in interstate commerce.  During the Relevant Period, Defendants obtained more than approximately $600,000 from at least eighty customers ("GBI Customers") through these fraudulent solicitations.  In fact, the strategy was fake, the purported performance reports were false, and—as in all Ponzi schemes—payouts of supposed profits to GBI Customers in actuality consisted of other customers' misappropriated funds.

2.      Defendants fraudulently solicited potential GBI Customers by making false and misleading claims and omissions about the performance and reliability of Jigsaw.  Then, once GBI Customers invested in the fraudulent scheme, Defendants attempted to conceal their

fraudulent solicitations and misappropriation of funds through issuing false reports to GBI Customers.  In this regard, Defendants prepared and conveyed to potential and actual GBI Customers numerous solicitation materials, asset and performance reports, and other materials (1) misrepresenting that GBI Customers averaged a 7-9% *monthly* increase in their Bitcoin balances net of all fees through Defendants' risk-protected strategy, when in fact they did not; (2) misrepresenting in individualized performance and balance reports that GBI Customers owned specific amounts of Bitcoin, when in fact those customers did not; and (3) misrepresenting that GBI's assets and performance were audited by a certified public accountant ("CPA"), when in fact they were not.  In reality, the strategy was fake, the supposed trading results were illusory, and any payouts of supposed profits to investors in fact were derived from funds fraudulently obtained from other investors.

3.      In an attempt to conceal the scheme, Gelfman staged a fake computer "hack" that supposedly caused the loss of nearly all GBI Customer funds.  This was a lie.  Later, again trying to conceal the full extent of the fraud, Gelfman claimed he had stolen only $25,000.  But this too was a lie.  In fact, Defendants misappropriated virtually all of the approximately $600,000 solicited from GBI Customers.  As a result, GBI Customers have lost most if not all of their invested funds due to Defendants' fraud and misappropriation.

4.      Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt. 1–190 (2017), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

5.      Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

6.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      <u>JURISDICTION AND VENUE</u>

7.      <u>Jurisdiction</u>.  This Court has jurisdiction of this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8.      <u>Venue</u>.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.   THE PARTIES

**9.**     Plaintiff **Commodity Futures Trading Commission** ("Commission" or

"CFTC") is an independent federal regulatory agency that is charged by Congress with the

administration and enforcement of the Act and the Regulations.  The Commission maintains its

principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

**10.**     Defendant **Gelfman Blueprint, Inc.** is a New York corporation based in Staten

Island, New York.  GBI was incorporated on August 7, 2014.  GBI's last known address is 533

Wilson Avenue, Staten Island, NY 10312.  GBI has never been registered with the Commission.

**11.**     Defendant **Nicholas Gelfman** is a resident of Brooklyn, New York.  Gelfman was

the CEO and Head Trader of GBI.  Gelfman has never been registered with the Commission.

### IV.   STATUTORY BACKGROUND

**12.**     Bitcoin and other virtual currencies are encompassed in the definition of

"commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).[1]

### V.   FACTS

**13.**     During the Relevant Period, Defendants solicited and received more than

approximately $600,000 from at least eighty GBI Customers, who invested amounts ranging

from a few hundred dollars to tens of thousands of dollars, for the purpose of entering into

contracts of sale of Bitcoin, a virtual currency, through electronic web-based Bitcoin trading

platforms based in various states and countries.

---

[1] For purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  Bitcoin and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

**Defendants Made False and Misleading Representations, and
Omitted Material Facts, to Solicit GBI Customers**

14.     During the Relevant Period, Defendants solicited customers in Manhattan, Staten

Island, and elsewhere to invest in GBI's fund.

15.     Gelfman solicited customers, and received and directed deposits, withdrawals,

and transfers of GBI Customer funds on behalf of GBI.

16.     Defendants' solicitations to potential GBI Customers to participate in GBI's

pooled fund included false and misleading representations and omissions of material facts—in

short, lies and deceit—about the profitability and safety of investing in GBI.

17.     Defendants made these false and misleading representations and omissions of

material facts to potential customers during the Relevant Period through the GBI website.

18.     For example, during the Relevant Period, GBI's website touted the high

investment performance of Defendants' high-frequency, algorithmic trading computer program

(or "bot") named Jigsaw.  In particular, GBI's website claimed that GBI's Jigsaw trading

strategy both generated monthly profits and protected against risk (such as the volatility of

Bitcoin prices, and the risk that the value of Bitcoin could drop) for customers invested in the

fund, with statements such as:

> INCREASED BITCOIN BALANCE Customers average a 7-9%
> monthly increase in ฿.  [฿ is a symbol used for Bitcoin]
>
> PROTECTING AGAINST VOLATILITY Trading results are
> maximized during price drops.

19.     These statements were false and misleading representations and omissions of

material facts.  In fact, GBI Customers did not average the 7-9% monthly increase in Bitcoin,

and in reality the purported strategy did not "maximize" trading results—i.e., achieve even

higher than 7-9% monthly returns—during price drops.

20.     During the Relevant Period, Defendants' primary Bitcoin trading account for its supposed Jigsaw trading strategy was at an international virtual currency exchange, under the name of TMJigsaw ("Defendants' Jigsaw trading account").

21.     The account records of Defendants' Jigsaw trading account reveal only infrequent and unprofitable trading.  In particular, during 2015, Defendants' Jigsaw trading account records reveal trading on only 17 calendar days that incurred approximately 185 Bitcoin in losses.

22.     Gelfman exclusively controlled and had access to Defendants' Jigsaw trading account.

23.     During the Relevant Period, GBI's website also touted GBI Customers' access to their current balances, deposits, and withdrawals though the GBI website's "interactive customer dashboard."

24.     These statements constituted false and misleading representations and omissions of material facts.  In fact, GBI Customers could not access their true current balances, deposits, and withdrawals through the website's "interactive customer dashboard."  As described below, the figures reflecting large gains provided through the dashboard were false.

25.     During the Relevant Period, these pages on GBI's website touting GBI's high investment performance, strategy, and account transparency were publicly available.

26.     Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through GBI marketing materials.

27.     For example, Defendants' marketing materials used for soliciting customers touted the high investment performance of Jigsaw through statements such as the following:

- Our fund earns customers a 7-11% monthly return on their bitcoins.

6

- Our customers on average are and have been averaging 7-9% profit a month on their Bitcoin Investments.

- As of August 1st, 2015 we had 85 customers, 2,367 bitcoins under management and 717 in revenue.

**28.** Using the then-prevailing exchange rate, 2,367 Bitcoin was equivalent to approximately $660,000, and 717 Bitcoin was equivalent to approximately $200,000.

**29.** These and similar statements about Defendants' trading performance and Bitcoin under management were false and misleading representations and omissions of material facts.

**30.** In fact, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in trading losses.

**31.** In fact, Defendants' Bitcoin under management was far, far less. Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (equivalent to approximately $73,000 using the then-prevailing exchange rate), no Bitcoin trading activity at all after early July 2015, and a Bitcoin balance of zero beginning in early August 2015.

**32.** Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through various internet social media websites, such as Instagram and Facebook, with statements such as:

We are a software development firm, currently offering customers access to a high frequency BTC [Bitcoin] trading program called "Jigsaw" (2% weekly BTC [Bitcoin] return).

**33.** These and similar statements that Jigsaw offered a 2% weekly Bitcoin return were false and misleading representations and omissions of material facts. In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

34.    During the Relevant Period, these social media solicitations touting GBI's high investment performance, strategy, and account transparency were publicly available.

35.    Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through internet chat room posts, with statements such as:

> The current return is advertised at 7-9% monthly over an extended time period, and is based on the return you receive after we take our commission.

36.    These and similar statements that Defendants provided customers with a 7-9% monthly return, after commission, over an extended time period, were false and misleading representations and omissions of material facts.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

37.    During the Relevant Period, such internet chat room solicitations touting GBI's high investment performance and strategy were publicly available.

38.    Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period in person.

39.    Typically, these false and misleading representations and omissions concerned GBI's net monthly returns, the safety of investments with GBI (such as the claim that Jigsaw consistently generated profits regardless of whether Bitcoin prices went up or down), and GBI Customers' ability to monitor their investments online through the GBI website.

40.    For example, in or around December 2014, in Manhattan, Gelfman and another GBI officer made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $50,000, all of which was misappropriated by Defendants.

41.     Similarly, in or around April 2015, in Brooklyn, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $60,000, all of which was misappropriated by Defendants.

42.     Similarly, in or around June 2015, in Staten Island, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $40,000, all of which was misappropriated by Defendants.

43.     Such statements in person by Defendants to these and numerous other potential customers were false and misleading representations and omissions of material facts.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in substantial Bitcoin losses, and GBI Customers could not verify and monitor their investments online, such as through logging into GBI website's customer "dashboard," since the information Defendants provided therein was falsified by Defendants.

44.     Defendants made these false and misleading representations and omissions of material facts to potential customers as well as existing GBI Customers on the GBI website, in marketing materials, in internet social media and chatroom websites, and in person knowingly or with reckless disregard for the truth.

**Defendants Provided False Account Statements and Made Other Misrepresentations to
GBI Customers**

45.    Defendants were fiduciaries of GBI Customers.

46.    Despite this, during the Relevant Period Defendants perpetuated their fraudulent

scheme by providing GBI Customers false reports, by obtaining false and misleading documents

from an accountant through deceit, and through other false and misleading representations and

omissions of material facts.

47.    Once GBI Customers had invested in GBI, Defendants provided GBI Customers

with password-protected access to restricted areas of Defendants' website where GBI Customers

could access and view account statements and reports purporting to show their account balances

and trading profits or losses.

48.    During the Relevant Period, these statements and reports to GBI Customers were

false and misleading because the reported trading conducted on behalf of customers did not

occur.  In reality, the account and performance statements misrepresented, and provided false

and misleading descriptions of, trading activity and account balances.

49.    For example, on or around August 1, 2015, one GBI Customer logged into the

GBI website and received from the GBI "dashboard" an account statement that the customer's

investment balance was 197.719 Bitcoin, worth $58,297.45 (purportedly using the then-

prevailing exchange rate).  This reported balance reflected customer profits (net of fees to GBI

and a subsequent deposit) of more than 38%, achieved in less than two months, based on the

customer's initial investment of approximately $40,000.

50.    In fact, this statement and report to the GBI Customer were false and misleading.

The reported balance did not exist, and the reported profits were illusory.  During that two-month

period, Defendants' Jigsaw trading account records reveal trading on only four calendar days that resulted in thousands of dollars in losses.

51.     During the Relevant Period, Defendants also provided account balance and profitability information by telephone to GBI Customers.

52.     The GBI Customer account balance and profitability information provided by Defendants to GBI Customers by telephone was false and misleading because the supposed trading conducted on behalf of investors did not occur, the balances did not exist, and the reported profits were illusory.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

53.     In or around July to October 2015, Defendants obtained a series of one-page documents from an accountant stating GBI's assets under management, specifically, the amount of GBI's balance at a particular Bitcoin exchange as of a particular date.

54.     These documents obtained from the accountant reflected that GBI's assets under management held at the specific exchange, an international platform advertised as the "world's largest and most advanced cryptocurrencies exchange," were increasing in value each month and, as of October 2015, were in excess of $840,000.

55.     These statements were false and misleading representations and omissions of material facts.

56.     In reality, Defendants' account balance was far, far less: Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (then equivalent to approximately $73,000), and a Bitcoin balance of zero beginning in early August 2015.

57.     Defendants fraudulently obtained the one-page account-balance documents from the accountant by providing the accountant with information Defendants knew to be misleading and false, such as false account or balance statements that Gelfman had generated with the intent to deceive.

58.     Referring to this accountant and these documents, Defendants represented to potential and actual GBI Customers that GBI had monthly CPA audited results and asserted balances under management according to the last CPA audit.

59.     These statements were false and misleading representations and omissions of material facts.

60.     In reality, this accountant was not a CPA.

61.     In reality, this accountant never performed an audit of GBI.

62.     In reality, the account balance documents stated false balances because the information that Defendants provided to the accountant was false and intended to mislead.

63.     Defendants made these and other false and misleading representations and omissions of material facts to potential and actual GBI Customers concerning trading activity and results, account balances, and CPA audits knowingly or with reckless disregard for the truth.

**Defendants Misappropriated GBI Customers' Funds**

64.     Between approximately January 2014 and December 2015, Defendants received in excess of approximately $600,000 from more than 80 GBI Customers.

65.     During the Relevant Period, Defendants misappropriated almost all of these GBI Customers' funds for improper and unauthorized uses, such as to pay GBI business expenses and to wrongfully enrich Gelfman.

66.     For example, during the Relevant Period, GBI charged GBI Customers fees in the form of large percentages of supposed Bitcoin trading profits.

67.     Nearly all GBI Customers were charged fees of approximately 50- 65% of those purported trading profits.

68.     Defendants' representations of trading results and profits for or on behalf of GBI Customers were false.  Consequently, all "fees" deducted by Defendants from GBI Customers' funds based on these false profits in fact were GBI Customer funds that Defendants misappropriated from GBI Customers.

69.     In or around October 2015, Gelfman told other GBI officers that a computer "hack" had caused GBI to lose all or nearly all of GBI Customers' investments.  Defendants then conveyed this story to GBI Customers to explain the loss of their investments.

70.     For instance, Defendants notified a GBI Customer, who had invested more than $50,000 beginning in December 2014, and whose investment in GBI's fund had purportedly generated tens of thousands of dollars of profits through Jigsaw, of the supposed hack and that all of the GBI Customer's investments were gone.  This GBI Customer was never repaid any of the investment.

71.     In fact, Defendants' statements about the supposed computer "hack" causing the loss of all or nearly all GBI's Bitcoin were false.

72.     In fact, there was no "hack" in October 2015 causing massive losses.  In fact, Defendants' Jigsaw trading account records reveal that the account had had a Bitcoin balance of zero since early August 2015.

73.     In fact, Defendants had misappropriated nearly all of the GBI Customers' funds for Defendants' own financial benefit and to transfer the funds illegally to other customers of the Ponzi scheme, and had invented the falsehood of the "hack" to conceal this misappropriation.

74.     To the extent any GBI Customers received any purported profits from GBI, those profits in fact consisted of funds that Defendants misappropriated from other GBI Customers, in the nature of a Ponzi scheme.

75.     In or around January 2016, Gelfman confessed to other GBI officers, such as the Chief Operating Officer and the Chief Compliance Officer, that he had stolen approximately $25,000 from GBI.

76.     In fact, Gelfman had misappropriated far in excess of $25,000 in GBI Customer funds.  In reality, Defendants misappropriated nearly all GBI Customer funds.

## Nicholas Gelfman's Invocation of Fifth Amendment Privilege Against Self-Incrimination

77.     On April 22, 2016, pursuant to an investigatory subpoena, Gelfman appeared before the Commission for testimony concerning GBI.

78.     In response to Division staff's questions at this testimony, Gelfman invoked his Fifth Amendment privilege against compelled self-incrimination.

## Gelfman Was a Controlling Person of GBI

79.     Defendants' website and marketing materials identified Gelfman as CEO and Head Trader of GBI.  Gelfman solicited investors on behalf of GBI, created and controlled the performance and investment information in solicitation materials, created and controlled the content of GBI's website, oversaw and controlled GBI's trading of Bitcoin, was a signatory to GBI bank accounts, and generated account information on behalf of GBI.

**Gelfman Acted as Agent for GBI**

**80.**     Through his actions as CEO and head trader overseeing Bitcoin trading by GBI, managing the purported Jigsaw bot, and calculating GBI purported performance results, and thus profits and fees, as well as through his additional actions of marketing GBI to potential investors, soliciting investors, providing information to the accountant during reviews of GBI's assets under management, and providing account information to GBI Customers, Gelfman acted in the scope of his employment and on behalf of GBI.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance

**Violations of Section 6(c)(1) of the Act and
Regulation 180.1(a) by Gelfman and GBI**

**81.**     Paragraphs 1 through 80 are re-alleged and incorporated herein by reference.

**82.**     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

**83.**     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

84.     During the Relevant Period, as described above, Defendants violated

Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with

contracts of sale of commodities in interstate commerce, making or attempting to make untrue or

misleading statements of material fact or omitting to state or attempting to omit material facts

necessary in order to make statements made not untrue or misleading, such as the following:

A.   Issuing performance statements and updates misrepresenting the supposed amount of bitcoins and profits in GBI Customers' purported accounts;

B.   Issuing written statements misrepresenting the amount of GBI's assets under management;

C.   Issuing written statements misrepresenting the profitability of Defendants' Bitcoin trading;

D.   Failing to disclose, and omitting, that GBI never achieved the advertised performance and returns—such as a 7-9% monthly increase in bitcoins—for its customers;

E.   Failing to disclose, and omitting, that GBI never was audited by a CPA; and

F.   Failing to disclose, and omitting, that Defendants were misappropriating GBI Customer funds.

85.     As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of a commodity

in interstate commerce, soliciting investors with false and misleading performance statements;

providing GBI Customers false account and performance statements that misrepresented GBI

Customers' investment performance; misrepresenting and omitting material facts on Defendants'

website and in other communications with investors regarding GBI's strategy, performance, and

16

CPA audits, as well as other material facts regarding GBI and GBI Customers' interest in the fund; and misappropriating GBI Customers' funds.

86.     Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

87.     By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a).

88.     The acts, omissions, and failures of Gelfman described in this Complaint occurred within the scope of his agency, employment, and office at GBI.  Accordingly, GBI is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as principal for its agent's acts, omissions, or failures in violation of the Section 6(c)(1) of the Act and Regulation 180.1(a).

89.     At all times relevant to this Complaint, Gelfman controlled GBI, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, GBI's conduct constituting the violations of GBI described in this Count.  Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Gelfman is liable for GBI's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

90.     Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1.

## VII.   <u>RELIEF REQUESTED</u>

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

**A.** An order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

**B.** An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with any Defendant, including any successor thereof, from:

    **i.** Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act, or Regulation 180.1(a);

    **ii.** Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    **iii.** Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

    **iv.** Having any commodity interests traded on Defendants' behalf;

    **v.** Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests; and/or

    **vi.** Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

**C.** An order requiring Defendants to pay civil monetary penalties, plus post-judgment interest thereon, in the amount of the greater of (1) $170,472 for each violation of the Act and Regulations, or (2) triple the monetary gain from violations of the Act and Regulations;

**D.** An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**E.** An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds any Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**F.** An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

**G.** An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least January 2014 to the date of such accounting;

**H.** An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

**I.** An order providing such other and further relief as the Court deems proper.

*     *     *

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.


Dated:  September 21, 2017

**COMMODITY FUTURES TRADING COMMISSION**

By: <u>s/ Gates S. Hurand</u>
Gates S. Hurand
Senior Trial Attorney
ghurand@cftc.gov
Phone: (646) 746-9700

K. Brent Tomer
Chief Trial Attorney
ktomer@cftc.gov
Phone: (646) 746-9700

Manal M. Sultan
Deputy Director
msultan@cftc.gov
Phone: (646) 746-9700

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION