UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                    Plaintiff,                              Case No. 17-7181 (PKC)

        v.                                                  ECF Case

GELFMAN BLUEPRINT, INC., and NICHOLAS
GELFMAN,

                    Defendants.

**[PROPOSED] FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION,
CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST DEFENDANT GELFMAN BLUEPRINT, INC.**

        This matter is before the Court upon Plaintiff Commodity Futures Trading Commission's

Motion for Default Judgment and Permanent Injunction ("Motion") pursuant to Rule 55(b)(2) of

the Federal Rules of Civil Procedure ("FRCP") and Rule 55.2(b) of the Local Rules of the

United States District Courts for the Southern and Eastern Districts of New York ("Local

Rules").

        On September 21, 2017, Plaintiff Commodity Futures Trading Commission ("Plaintiff"

or the "Commission") filed its Complaint for Injunctive and Other Equitable Relief, Restitution,

and Civil Monetary Penalties under the Commodity Exchange Act (ECF No. 1) (the "Complaint"

or "Compl.") against Defendants Gelfman Blueprint, Inc. ("GBI") and Nicholas Gelfman

("Gelfman") (collectively, "Defendants").  GBI was properly served with process on September

25, 2017.  (ECF No. 9.)  Gelfman was properly served with process on September 26, 2017.

(ECF No. 10.)  Defendant GBI failed to answer or otherwise move with respect to the Complaint

within the time permitted by FRCP 12(a)(1), GBI has never appeared by attorney representative, and the Clerk of Court entered GBI's default on December 20, 2017.  (ECF No. 18.)

The Commission has moved this Court to grant final judgment by default against Defendant GBI, order permanent injunctive relief, and impose a restitution obligation and a civil monetary penalty.  Upon the Commission's Motion, and having carefully considered the Complaint (the allegations of which are well-pleaded and hereby taken as true), the Motion, and other written submissions filed with the Court, and being fully advised in the premises, pursuant to FRCP 55(b)(2) and Local Rule 55.2(b), it is hereby **ORDERED AND ADJUDGED** that:

Plaintiff's Motion be and the same is hereby **GRANTED**; and

Pursuant to FRCP 55 and 58, Default Judgment be and the same is hereby **ENTERED** in favor of Plaintiff and against Defendant GBI.

Accordingly, the Court enters the following findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalty, and Other Statutory and Equitable Relief ("Order") pursuant to Sections 6c and 6d of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein.

## I.     FINDINGS OF FACT

### A.     The Parties

**1.**     Plaintiff Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 1–26 (2012), and the Commission Regulations ("CFTC Regulations") promulgated thereunder, 17 C.F.R. pt. 1–190 (2018).  (Compl. ¶ 9.)

**2.**     Defendant Gelfman Blueprint, Inc. is a New York corporation based in Staten Island, New York, and was incorporated on August 7, 2014.  GBI's last known address is 533

2

Wilson Avenue, Staten Island, NY 10312.  GBI has never been registered with the Commission. (Compl. ¶ 10.)

**3.**     Defendant Nicholas Gelfman is a resident of Brooklyn, New York.  Gelfman was the CEO and Head Trader of GBI.  Gelfman has never been registered with the Commission. (Compl. ¶ 11.)

### B.     Defendants' Fraudulent Scheme in Violation of 7 U.S.C. § 13a-1(a) (2012) and CFTC Regulation 180.1

**4.**     During the Relevant Period, Defendants solicited and received more than approximately $600,000 from at least eighty GBI Customers, who invested amounts ranging from a few hundred dollars to tens of thousands of dollars, for the purpose of entering into contracts of sale of Bitcoin, a virtual currency, through electronic web-based Bitcoin trading platforms based in various states and countries.  (Compl. ¶ 13.)

### Defendants Made False and Misleading Representations, and Omitted Material Facts, to Solicit GBI Customers

**5.**     During the Relevant Period, Defendants solicited customers in Manhattan, Staten Island, and elsewhere to invest in GBI's fund.  (Compl. ¶ 14.)

**6.**     Gelfman solicited customers, and received and directed deposits, withdrawals, and transfers of GBI Customer funds on behalf of GBI.  (Compl. ¶ 15.)

**7.**     Defendants' solicitations to potential GBI Customers to participate in GBI's pooled fund included false and misleading representations and omissions of material facts—in short, lies and deceit—about the profitability and safety of investing in GBI.  (Compl. ¶ 16.)

**8.**     Defendants made these false and misleading representations and omissions of material facts to potential customers during the Relevant Period through the GBI website. (Compl. ¶ 17.)

9.     For example, during the Relevant Period, GBI's website touted the high investment performance of Defendants' high-frequency, algorithmic trading computer program (or "bot") named Jigsaw.  In particular, GBI's website claimed that GBI's Jigsaw trading strategy both generated monthly profits and protected against risk (such as the volatility of Bitcoin prices, and the risk that the value of Bitcoin could drop) for customers invested in the fund, with statements such as:

> INCREASED BITCOIN BALANCE Customers average a 7-9% monthly increase in ฿.  [฿ is a symbol used for Bitcoin]
>
> PROTECTING AGAINST VOLATILITY Trading results are maximized during price drops.

(Compl. ¶ 18.)

10.     These statements were false and misleading representations and omissions of material facts.  In fact, GBI Customers did not average the 7-9% monthly increase in Bitcoin, and in reality the purported strategy did not "maximize" trading results—i.e., achieve even higher than 7-9% monthly returns—during price drops.  (Compl. ¶ 19.)

11.     During the Relevant Period, Defendants' primary Bitcoin trading account for its supposed Jigsaw trading strategy was at an international virtual currency exchange, under the name of TMJigsaw ("Defendants' Jigsaw trading account").  (Compl. ¶ 20.)

12.     The account records of Defendants' Jigsaw trading account reveal only infrequent and unprofitable trading.  In particular, during 2015, Defendants' Jigsaw trading account records reveal trading on only 17 calendar days that incurred approximately 185 Bitcoin in losses. (Compl. ¶ 21.)

13.     Gelfman exclusively controlled and had access to Defendants' Jigsaw trading account.  (Compl. ¶ 22.)

14.     During the Relevant Period, GBI's website also touted GBI Customers' access to their current balances, deposits, and withdrawals though the GBI website's "interactive customer dashboard."  (Compl. ¶ 23.)

15.     These statements constituted false and misleading representations and omissions of material facts.  In fact, GBI Customers could not access their true current balances, deposits, and withdrawals through the website's "interactive customer dashboard."  As described below, the figures reflecting large gains provided through the dashboard were false.  (Compl. ¶ 24.)

16.     During the Relevant Period, these pages on GBI's website touting GBI's high investment performance, strategy, and account transparency were publicly available.  (Compl. ¶ 25.)

17.     Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through GBI marketing materials.  (Compl. ¶ 26.)

18.     For example, Defendants' marketing materials used for soliciting customers touted the high investment performance of Jigsaw through statements such as the following:

- Our fund earns customers a 7-11% monthly return on their bitcoins.

- Our customers on average are and have been averaging 7-9% profit a month on their Bitcoin Investments.

- As of August 1st, 2015 we had 85 customers, 2,367 bitcoins under management and 717 in revenue.

(Compl. ¶ 27.)

19.     Using the then-prevailing exchange rate, 2,367 Bitcoin was equivalent to approximately $660,000, and 717 Bitcoin was equivalent to approximately $200,000.  (Compl. ¶ 28.)

20.    These and similar statements about Defendants' trading performance and Bitcoin under management were false and misleading representations and omissions of material facts. (Compl. ¶ 29.)

21.    In fact, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in trading losses.  (Compl. ¶ 30.)

22.    In fact, Defendants' Bitcoin under management was far, far less.  Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (equivalent to approximately $73,000 using the then-prevailing exchange rate), no Bitcoin trading activity at all after early July 2015, and a Bitcoin balance of zero beginning in early August 2015.  (Compl. ¶ 31.)

23.    Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through various internet social media websites, such as Instagram and Facebook, with statements such as:

> We are a software development firm, currently offering customers
> access to a high frequency BTC [Bitcoin] trading program called
> "Jigsaw" (2% weekly BTC [Bitcoin] return).

(Compl. ¶ 32.)

24.    These and similar statements that Jigsaw offered a 2% weekly Bitcoin return were false and misleading representations and omissions of material facts.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.  (Compl. ¶ 33.)

25.    During the Relevant Period, these social media solicitations touting GBI's high investment performance, strategy, and account transparency were publicly available.  (Compl. ¶ 34.)

26. Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through internet chat room posts, with statements such as:

> The current return is advertised at 7-9% monthly over an extended time period, and is based on the return you receive after we take our commission.

(Compl. ¶ 35.)

27. These and similar statements that Defendants provided customers with a 7-9% monthly return, after commission, over an extended time period, were false and misleading representations and omissions of material facts. In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses. (Compl. ¶ 36.)

28. During the Relevant Period, such internet chat room solicitations touting GBI's high investment performance and strategy were publicly available. (Compl. ¶ 37.)

29. Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period in person. (Compl. ¶ 38.)

30. Typically, these false and misleading representations and omissions concerned GBI's net monthly returns, the safety of investments with GBI (such as the claim that Jigsaw consistently generated profits regardless of whether Bitcoin prices went up or down), and GBI Customers' ability to monitor their investments online through the GBI website. (Compl. ¶ 39.)

31. For example, in or around December 2014, in Manhattan, Gelfman and another GBI officer made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person. This person then became a GBI Customer, over time investing more than $50,000, all of which was misappropriated by Defendants. (Compl. ¶ 40.)

32.     Similarly, in or around April 2015, in Brooklyn, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $60,000, all of which was misappropriated by Defendants.  (Compl. ¶ 41.)

33.     Similarly, in or around June 2015, in Staten Island, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $40,000, all of which was misappropriated by Defendants.  (Compl. ¶ 42.)

34.     Such statements in person by Defendants to these and numerous other potential customers were false and misleading representations and omissions of material facts.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in substantial Bitcoin losses, and GBI Customers could not verify and monitor their investments online, such as through logging into GBI website's customer "dashboard," since the information Defendants provided therein was falsified by Defendants.  (Compl. ¶ 43.)

35.     Defendants made these false and misleading representations and omissions of material facts to potential customers as well as existing GBI Customers on the GBI website, in marketing materials, in internet social media and chatroom websites, and in person knowingly or with reckless disregard for the truth.  (Compl. ¶ 44.)

**Defendants Provided False Account Statements and Made Other Misrepresentations to GBI Customers**

36.     Defendants were fiduciaries of GBI Customers.  (Compl. ¶ 45.)

8

37.     Despite this, during the Relevant Period Defendants perpetuated their fraudulent scheme by providing GBI Customers false reports, by obtaining false and misleading documents from an accountant through deceit, and through other false and misleading representations and omissions of material facts.  (Compl. ¶ 46.)

38.     Once GBI Customers had invested in GBI, Defendants provided GBI Customers with password-protected access to restricted areas of Defendants' website where GBI Customers could access and view account statements and reports purporting to show their account balances and trading profits or losses.  (Compl. ¶ 47.)

39.     During the Relevant Period, these statements and reports to GBI Customers were false and misleading because the reported trading conducted on behalf of customers did not occur.  In reality, the account and performance statements misrepresented, and provided false and misleading descriptions of, trading activity and account balances.  (Compl. ¶ 48.)

40.     For example, on or around August 1, 2015, one GBI Customer logged into the GBI website and received from the GBI "dashboard" an account statement that the customer's investment balance was 197.719 Bitcoin, worth $58,297.45 (purportedly using the then-prevailing exchange rate).  This reported balance reflected customer profits (net of fees to GBI and a subsequent deposit) of more than 38%, achieved in less than two months, based on the customer's initial investment of approximately $40,000.  (Compl. ¶ 49.)

41.     In fact, this statement and report to the GBI Customer were false and misleading. The reported balance did not exist, and the reported profits were illusory.  During that two-month period, Defendants' Jigsaw trading account records reveal trading on only four calendar days that resulted in thousands of dollars in losses.  (Compl. ¶ 50.)

42.     During the Relevant Period, Defendants also provided account balance and profitability information by telephone to GBI Customers.  (Compl. ¶ 51.)

43.     The GBI Customer account balance and profitability information provided by Defendants to GBI Customers by telephone was false and misleading because the supposed trading conducted on behalf of investors did not occur, the balances did not exist, and the reported profits were illusory.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.  (Compl. ¶ 52.)

44.     In or around July to October 2015, Defendants obtained a series of one-page documents from an accountant stating GBI's assets under management, specifically, the amount of GBI's balance at a particular Bitcoin exchange as of a particular date.  (Compl. ¶ 53.)

45.     These documents obtained from the accountant reflected that GBI's assets under management held at the specific exchange, an international platform advertised as the "world's largest and most advanced cryptocurrencies exchange," were increasing in value each month and, as of October 2015, were in excess of $840,000.  (Compl. ¶ 54.)

46.     These statements were false and misleading representations and omissions of material facts.  (Compl. ¶ 55.)

47.     In reality, Defendants' account balance was far, far less: Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (then equivalent to approximately $73,000), and a Bitcoin balance of zero beginning in early August 2015.  (Compl. ¶ 56.)

48.     Defendants fraudulently obtained the one-page account-balance documents from the accountant by providing the accountant with information Defendants knew to be misleading

and false, such as false account or balance statements that Gelfman had generated with the intent to deceive.  (Compl. ¶ 57.)

49.    Referring to this accountant and these documents, Defendants represented to potential and actual GBI Customers that GBI had monthly CPA audited results and asserted balances under management according to the last CPA audit.  (Compl. ¶ 58.)

50.    These statements were false and misleading representations and omissions of material facts.  (Compl. ¶ 59.)

51.    In reality, this accountant was not a CPA.  (Compl. ¶ 60.)

52.    In reality, this accountant never performed an audit of GBI.  (Compl. ¶ 61.)

53.    In reality, the account balance documents stated false balances because the information that Defendants provided to the accountant was false and intended to mislead. (Compl. ¶ 62.)

54.    Defendants made these and other false and misleading representations and omissions of material facts to potential and actual GBI Customers concerning trading activity and results, account balances, and CPA audits knowingly or with reckless disregard for the truth. (Compl. ¶ 63.)

**Defendants Misappropriated GBI Customers' Funds**

55.    Between approximately January 2014 and December 2015, Defendants received in excess of approximately $600,000 from more than 80 GBI Customers.  (Compl. ¶ 64.)

56.    During the Relevant Period, Defendants misappropriated almost all of these GBI Customers' funds for improper and unauthorized uses, such as to pay GBI business expenses and to wrongfully enrich Gelfman.  (Compl. ¶ 65.)

11

57.     For example, during the Relevant Period, GBI charged GBI Customers fees in the form of large percentages of supposed Bitcoin trading profits.  (Compl. ¶ 66.)

58.     Nearly all GBI Customers were charged fees of approximately 50- 65% of those purported trading profits.  (Compl. ¶ 67.)

59.     Defendants' representations of trading results and profits for or on behalf of GBI Customers were false.  Consequently, all "fees" deducted by Defendants from GBI Customers' funds based on these false profits in fact were GBI Customer funds that Defendants misappropriated from GBI Customers.  (Compl. ¶ 68.)

60.     In or around October 2015, Gelfman told other GBI officers that a computer "hack" had caused GBI to lose all or nearly all of GBI Customers' investments.  Defendants then conveyed this story to GBI Customers to explain the loss of their investments.  (Compl. ¶ 69.)

61.     For instance, Defendants notified a GBI Customer, who had invested more than $50,000 beginning in December 2014, and whose investment in GBI's fund had purportedly generated tens of thousands of dollars of profits through Jigsaw, of the supposed hack and that all of the GBI Customer's investments were gone.  This GBI Customer was never repaid any of the investment.  (Compl. ¶ 70.)

62.     In fact, Defendants' statements about the supposed computer "hack" causing the loss of all or nearly all GBI's Bitcoin were false.  (Compl. ¶ 71.)

63.     In fact, there was no "hack" in October 2015 causing massive losses.  In fact, Defendants' Jigsaw trading account records reveal that the account had had a Bitcoin balance of zero since early August 2015.  (Compl. ¶ 72.)

64.     In fact, Defendants had misappropriated nearly all of the GBI Customers' funds for Defendants' own financial benefit and to transfer the funds illegally to other customers of the

Ponzi scheme, and had invented the falsehood of the "hack" to conceal this misappropriation. (Compl. ¶ 73.)

65.     To the extent any GBI Customers received any purported profits from GBI, those profits in fact consisted of funds that Defendants misappropriated from other GBI Customers, in the nature of a Ponzi scheme.  (Compl. ¶ 74.)

66.     In or around January 2016, Gelfman confessed to other GBI officers, such as the Chief Operating Officer and the Chief Compliance Officer, that he had stolen approximately $25,000 from GBI.  (Compl. ¶ 75.)

67.     In fact, Gelfman had misappropriated far in excess of $25,000 in GBI Customer funds.  In reality, Defendants misappropriated nearly all GBI Customer funds.  (Compl. ¶ 76.)

**Gelfman Was a Controlling Person of GBI**

68.     Defendants' website and marketing materials identified Gelfman as CEO and Head Trader of GBI.  Gelfman solicited investors on behalf of GBI, created and controlled the performance and investment information in solicitation materials, created and controlled the content of GBI's website, oversaw and controlled GBI's trading of Bitcoin, was a signatory to GBI bank accounts, and generated account information on behalf of GBI.  (Compl. ¶ 79.)

**Gelfman Acted as Agent for GBI**

69.     Through his actions as CEO and head trader overseeing Bitcoin trading by GBI, managing the purported Jigsaw bot, and calculating GBI purported performance results, and thus profits and fees, as well as through his additional actions of marketing GBI to potential investors, soliciting investors, providing information to the accountant during reviews of GBI's assets under management, and providing account information to GBI Customers, Gelfman acted in the scope of his employment and on behalf of GBI.  (Compl. ¶ 80.)

**GBI's Gains from the Scheme**

70.      GBI's gross monetary gain from customers through the scheme was in excess of $618,000, specifically $618,574.36.  (Declaration of Christopher Giglio dated October 1, 2018 ("Giglio Decl."), at ¶ 6.)

**Amounts Lost by Customers**

71.      GBI returned only $64,271.93 to customers, and because $432.05 of this amount was in excess of what the relevant customers had invested, the net amount returned to customers is $63,839.88.  (Giglio Decl. ¶¶ 6-7.)  The difference between the amount GBI solicited and accepted from customers ($618,574.36) and the net amount GBI returned to customers ($63,839.88) is $554,734.48.

## II.      CONCLUSIONS OF LAW

### A.      Jurisdiction and Venue

72.      Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief in United States district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that district courts "shall have jurisdiction to entertain such actions."  This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (2012) (federal question) and 28 U.S.C. § 1345 (2012) (United States as Plaintiff).

73.      With respect to personal jurisdiction, GBI is a New York corporation based in Staten Island, New York (Compl. ¶ 10), that did business in Staten Island, Manhattan, and elsewhere (*e.g.*, Compl. ¶ 14).  Pursuant to Rule 4(h)(1) of the Federal Rules of Civil Procedure,

GBI was served personally via the New York Secretary of State, a registered agent of GBI.[1]

(ECF No. 9.)

74.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2012), because Defendants transacted business in this District, and certain

transactions, acts, practices, and courses of business described above occurred in this District.

**B.     Defendant GBI Committed Fraud in Connection with Contracts of Sale of Bitcoin, a Commodity in Interstate Commerce, in Violation of Section 6(c) of the Act and CFTC Regulation 180.1**

75.     7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) make it unlawful for any person, in

connection with contracts of sale of any commodity in interstate commerce, including virtual

currencies such as Bitcoin, to intentionally or recklessly: (1) use or employ, or attempt to use or

employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make,

any untrue or misleading statement of a material fact or to omit to state a material fact necessary

in order to make the statements made not untrue or misleading; or (3) engage, or attempt to

engage, in any act, practice, or course of business, which operates or would operate as a fraud or

deceit upon any person.  Virtual currencies such as Bitcoin are encompassed in the definition of

"commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).  *CFTC v. McDonnell*, 287

F. Supp. 3d 213, 217 (E.D.N.Y. 2018); *see also CFTC v. Gillespie*, No. 18-cv-10077, ECF No.

106, at 4-9 (D. Mass. Sept. 26, 2018) (denial of motion to dismiss).

76.     By the conduct described above and in the Complaint, GBI, by and through its

officers, employees, or agents, intentionally or recklessly, in connection with contracts of sale of

any commodity in interstate commerce, namely the virtual currency Bitcoin: (1) used or

---

[1] N.Y. Bus. Corp. Law §§ 304(a), 306(a) (service on New York corporations via the New York Secretary of State); 7 U.S.C. § 13a-1(a) and (e) (enforcement provision for actions by CFTC providing for nationwide service of process); *CFTC v. Worldwide Commodity Corp.*, 366 F. Supp. 2d 276, 280-83 (E.D. Pa. 2005) (where nationwide service is provided by statute, relevant forum for jurisdictional analysis is the United States); *e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (for corporations, place of incorporation and principal place of business are paradigmatic bases for general personal jurisdiction) (internal quotations omitted).

employed, or attempted to use or employ, a manipulative device, scheme, or artifice to defraud;
(2) made, or attempted to make, untrue or misleading statements of a material fact or to omit to
state a material fact necessary in order to make the statements made not untrue or misleading;
and (3) engaged, or attempted to engage, in an act, practice, or course of business, which
operates or would operate as a fraud or deceit upon any person, in violation of 7 U.S.C. § 9(1)(a)
and 17 C.F.R. § 180.1(a).

**77.**     Defendant GBI, as set forth in the Complaint, cheated and defrauded, and
attempted to cheat and defraud, customers, in connection with contracts of sale of bitcoin, a
commodity in interstate commerce.  Defendants misrepresented that they would trade Bitcoin
through a highly successful and reliable algorithmic trading "bot," and that customers would
achieve returns of 7-9%, or even higher, per month.  Defendants also misappropriated customer
funds and never achieved the advertised results with GBI customer funds.  Defendants further
concealed and perpetuated their fraud by falsely stating that their website was hacked.

**78.**     The acts, omissions, and failures of GBI officers, employees, and agents
described in the Complaint occurred within the scope of their agency, employment, and office at
GBI.  Accordingly, GBI is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B)
(2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018), as principal for its agents' acts, omissions, or
failures in violation of 7 U.S.C. § 9(1)(a) and 17 C.F.R. § 180.1(a).

### III.   **PERMANENT INJUNCTION**

**IT IS HEREBY ORDERED THAT:**

    **79.**    Pursuant to Section 6c of the Commodity Exchange Act (the "Act") , 7 U.S.C. § 13a-1 (2012), Defendant GBI, its officers, agents, servants, employees, successors, assigns, and/or attorneys, and all persons in active concert or participation with Defendant GBI who receive actual notice of this Order by personal service or otherwise, are hereby permanently restrained, enjoined, and prohibited from directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly:

        **A.**  using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud;

        **B.**  making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; and

        **C.**  engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person;

in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and/or Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2018).

    **80.**    Defendant GBI, its officers, agents, servants, employees, successors, assigns, and/or attorneys, and all persons in active concert or participation with Defendant GBI who receive actual notice of this Order by personal service or otherwise, are permanently restrained, enjoined, and prohibited from directly or indirectly:

        **A.**  Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012);

**B.** Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)) and/or the virtual currency Bitcoin for its own personal account or for any account in which it has a direct or indirect interest;

**C.** Having any commodity interests and/or the virtual currency Bitcoin traded on its behalf;

**D.** Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests and/or the virtual currency Bitcoin;

**E.** Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests and/or the virtual currency Bitcoin;

**F.** Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

**G.** Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018).

## IV.    RESTITUTION AND CIVIL MONETARY PENALTY

**IT IS FURTHER ORDERED THAT:**

### A.    Restitution

**81.**    Pursuant to Section 6c(d)(3)(A) of the CEA, 7 U.S.C. § 13a-1(d)(3)(A) (2012), Defendant GBI shall pay restitution in the amount of five hundred fifty-four thousand seven hundred thirty-four dollars and forty-eight cents ($554,734.48), plus post-judgment interest (the "Restitution Obligation").  Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

**82.**    For amounts disbursed to customers as a result of satisfaction of any restitution obligation of Defendant Nicholas Gelfman in this matter, GBI shall receive a dollar-for-dollar credit against the Restitution Obligation.

**83.**    For amounts disbursed to customers as a result of satisfaction of the Restitution Obligation of GBI, Nicholas Gelfman shall receive a dollar-for-dollar credit against any restitution obligation he may have in this matter.

**84.**    To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendant GBI's customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall collect restitution payments from Defendant GBI and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

**85.**    Defendant GBI shall make Restitution Obligation payments under this Order to the Monitor in the name "Gelfman—Settlement/Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order,

certified check, bank cashier's check, or bank money order, to the Office of Administration,
National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606
under cover letter that identifies the paying Defendant and the name and docket number of this
proceeding.  Defendant GBI shall simultaneously transmit copies of the cover letter and the form
of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three
Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

86.     The Monitor shall oversee the Restitution Obligation and shall have the discretion
to determine the manner of distribution of such funds in an equitable fashion to Defendant GBI's
customers identified by the Commission or may defer distribution until such time as the Monitor
deems appropriate.  In the event that the amount of Restitution Obligation payments to the
Monitor are of a de minimis nature such that the Monitor determines that the administrative cost
of making a distribution to eligible customers is impractical, the Monitor may, in its discretion,
treat such restitution payments as civil monetary penalty payments, which the Monitor shall
forward to the Commission following the instructions for civil monetary penalty payments set
forth in Part B below.

87.     Defendant GBI shall cooperate with the Monitor as appropriate to provide such
information as the Monitor deems necessary and appropriate to identify Defendant GBI's
customers to whom the Monitor, in its sole discretion, may determine to include in any plan for
distribution of any Restitution Obligation payments.  Defendant GBI shall execute any
documents necessary to release funds that it has in any repository, bank, investment or other
financial institution, wherever located, in order to make partial or total payment toward the
Restitution Obligation.

88.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant GBI's customers during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

89.     The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendant GBI or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

90.     Pursuant to FRCP 71, each customer of Defendants who suffered a loss (excluding GBI principals and officers) is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendant GBI to ensure continued compliance with any provision of this Order and to hold Defendant GBI in contempt for any violations of any provision of this Order.

91.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendant GBI's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

   **B.      Civil Monetary Penalty**

92.     Pursuant to Section 6c(d)(1)(A) of the CEA, 7 U.S.C. § 13a-1(d)(1)(A) (2012), Defendant GBI shall pay a civil monetary penalty in the amount of one million eight hundred fifty-seven thousand dollars ($1,854,000) (the "CMP Obligation"), which is equivalent to approximately triple the monetary gain to Defendants of more than $618,000 from the

violations—i.e., three times the gross amount of customer funds obtained by Defendants that Defendants used for their own benefit or for the benefit of the fraud.

93.     Defendant GBI shall pay the CMP Obligation within ten (10) days of the date of the entry of this Order.  If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.  Defendant GBI shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendant GBI shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendant GBI shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  Defendant GBI shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### C.       Provision Related to Monetary Sanctions

**94.**     *Partial satisfaction*:  Acceptance by the Commission or the Monitor of any partial

payment of GBI's Restitution Obligation or CMP Obligation shall not be deemed a waiver of

GBI's obligation to make further payments pursuant to this Order, or a waiver of the

Commission's right to seek to compel payment of any remaining balance.

## V.       MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

**95.**     *Notice.*  All notices required to be given by any provision in this Order shall be

sent certified mail, return receipt requested, as follows:

Notice to Commission:

Manal M. Sultan
Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005

Notice to Monitor:

Daniel Driscoll
Executive Vice President, COO
National Futures Association
300 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606-3447

All such notices to the Commission or the Monitor shall reference the name and docket number

of this action.

**96.**     *Change of Address/Phone.*  Until such time as Defendant GBI satisfies in full the

Restitution Obligation and the CMP Obligation as set forth in this Order, Defendant GBI shall

provide written notice to the Commission by certified mail of any change to its telephone

number and mailing address within ten (10) calendar days of the change.

**97.** *Invalidation.* If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

**98.** *Injunctive and Equitable Relief Provisions*: The injunctive and equitable relief provisions of this Order shall be binding upon Defendant GBI, upon any person under its authority or control, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendant GBI.

## VI. CONTINUING JURISDICTION OF THIS COURT

### IT IS FURTHER ORDERED THAT:

**99.** This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendant GBI to modify, or for relief from, the terms of this Order.

\*     \*     \*

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalty, and Other Statutory and Equitable Relief Against Defendant Gelfman Blueprint, Inc. forthwith and without further notice.

**IT IS SO ORDERED.**

Date: __October 15_____, 2018

_____
P. Kevin Castel
United States District Judge

24